373 U.S. 33 (1963)
BROTHERHOOD OF LOCOMOTIVE ENGINEERS ET AL.
v.
LOUISVILLE & NASHVILLE RAILROAD CO.
No. 94.
Supreme Court of United States.
Argued February 21, 1963.
Decided April 29, 1963.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.
Harold C. Heiss argued the cause for petitioners. With him on the briefs were Chas. I. Dawson, Russell B. Day, Harold N. McLaughlin, Wayland K. Sullivan and V. C. Shuttleworth.
John P. Sandidge argued the cause for respondent. With him on the brief were H. G. Breetz, W. L. Grubbs, M. D. Jones and Joseph L. Lenihan.
MR. JUSTICE STEWART delivered the opinion of the Court.
The respondent railroad company dismissed an employee named Humphries on the ground that he had assaulted two fellow employees. His union, the Brotherhood *34 of Locomotive Firemen and Enginemen, protested the discharge. The customary grievance procedures on the property were invoked, but to no avail. To enforce its demand that Humphries be reinstated, the union threatened to call a strike. Before a strike was actually called, the respondent submitted the dispute to the National Railroad Adjustment Board, pursuant to § 3 First (i) of the Railway Labor Act.[1] The Adjustment Board sustained the employee's claim for reinstatement in the following brief order:
"Claim sustained with pay for time lost as the rule is construed on the property."
The respondent reinstated Humphries, and, for the purpose of computing his pay for lost time, it asked him to submit a record of the outside income he had earned during the period which followed his dismissal. Humphries and his union resisted this demand for information, claiming that the Adjustment Board's award entitled him to full pay for the time lost, without deduction for outside income.
Several conferences were called to discuss this dispute. When the respondent refused to accede to the union's interpretation of the award's lost-time provision, the union again threatened to call a strike. To forestall the impending work stoppage, the respondent twice petitioned *35 the Adjustment Board to resolve the dispute as to the amount due Humphries under the award, asking the Board first for a clarification of its earlier order and then submitting the disputed issue for resolution in a separate de novo proceeding. The Adjustment Board refused to entertain either petition, stating in its second order that "The matter must be judged res judicata" in light of the original Adjustment Board decision dealing with the Humphries controversy.
After the respondent had submitted the dispute for the second time to the Adjustment Board, the union set a definite strike deadline. The respondent then brought the present lawsuit in a Federal District Court, requesting injunctive relief against the threatened strike. After the Adjustment Board proceedings were completed, the court issued the injunction, holding that under the Railway Labor Act the union could not legally strike for the purpose of enforcing its interpretation of the Board's money award, but must instead utilize the judicial enforcement procedure provided by § 3 First (p) of the Act.[2] 190 F. *36 Supp. 829. The Court of Appeals for the Sixth Circuit affirmed, 297 F. 2d 608, and we granted certiorari to consider an obviously substantial question affecting the administration of the Railway Labor Act. 370 U. S. 908. For the reasons stated in this opinion, we conclude that the District Court and the Court of Appeals correctly decided the issues presented, and we accordingly affirm the judgment before us.
The statute governing the central issue in this case is § 3 First of the Railway Labor Act, covering so-called "minor disputes."[3] The present provisions of § 3 First were added to the Act in 1934.[4] The historical background of these provisions has been described at length in previous opinions of this Court. See Elgin, J. & E. R. Co. v. Burley, 325 U. S. 711; Trainmen v. Chicago R. & I. R. Co., 353 U. S. 30; Union Pacific R. Co. v. Price, 360 U. S. 601. As explained in detail in those opinions, the 1934 amendments were enacted because the scheme of voluntary arbitration contained in the original Railway Labor Act[5] had proved incapable of achieving peaceful settlements of grievance disputes. To arrive at a more efficacious solution, Congress, at the behest of the several *37 interests involved, settled upon a new detailed and comprehensive statutory grievance procedure.
Subsections (a) to (h) of § 3 First create the National Railroad Adjustment Board and define its composition and duties.[6] Subsection (i) provides that it shall be the duty of both the carrier and the union to negotiate on the property concerning all minor disputes which arise; failing adjustment by this means, "the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board . . . ."[7] Subsection (l) directs the appointment of a neutral referee to sit on the Adjustment Board in the event its regular members are evenly divided.[8] Subsection (m) makes awards of the Adjustment Board "final and binding upon both parties to the dispute, except insofar as they shall contain a money award." It further directs the Adjustment Board to entertain a petition for clarification of its award if a dispute should arise over its meaning.[9] And finally, subsections (o) and (p) describe the manner in which Adjustment Board awards may be enforced, providing for the issuance of an order by the Board itself and for judicial action to enforce such orders.[10]
*38 The several decisions of this Court interpreting § 3 First have made it clear that this statutory grievance procedure is a mandatory, exclusive, and comprehensive system for resolving grievance disputes. The right of one party to place the disputed issue before the Adjustment Board, with or without the consent of the other, has been firmly established. Trainmen v. Chicago R. & I. R. Co., 353 U. S., at 34. And the other party may not defeat this right by resorting to some other forum. Thus, in Order of Conductors v. Southern R. Co., 339 U. S. 255, the Court held that a state court could not take jurisdiction over an employer's declaratory judgment action concerning an employee grievance subject to § 3 First, because, "if a carrier or a union could choose a court instead of the Board, the other party would be deprived of the privilege conferred by § 3 First (i) . . . which provides that after negotiations have failed `either party' may refer the dispute to the appropriate division of the Adjustment Board." Id., at 256-257. See Slocum v. Delaware, L. & W. R. Co., 339 U. S. 239. Similarly, an employee is barred from choosing another forum in which to litigate claims arising under the collective agreement. Pennsylvania R. Co. v. Day, 360 U. S. 548, 552-553. A corollary of this view has been the principle that the process of decision through the Adjustment Board cannot be challenged collaterally by methods of review not provided for in the statute. In Union Pacific R. Co. v. Price, 360 U. S. 601, the Court held that an employee could not resort to a common law action for wrongful discharge after the same claim had been rejected on the merits in a proceeding before the Adjustment Board. The decision in that *39 case was based upon the conclusion that, when invoked, the remedies provided for in § 3 First were intended by Congress to be the complete and final means for settling minor disputes. 360 U. S., at 616-617. See also, Washington Terminal Co. v. Boswell, 75 U. S. App. D. C. 1, 124 F. 2d 235 (per Rutledge, J.), aff'd by an equally divided court, 319 U. S. 732.
Of even more particularized relevance to the issue now before us is this Court's decision in Trainmen v. Chicago R. & I. R. Co., supra. There the railroad had submitted several common grievances to the Adjustment Board pursuant to § 3 First (i). The union had resisted the submission, and called a strike to enforce its grievance demands. The Court held that the strike violated those provisions of the Act making the minor dispute procedures compulsory on both parties. In an opinion which reviewed at length the legislative history of the 1934 amendments, the Court concluded that this history entirely supported the plain import of the statutory languagethat Congress had intended the grievance procedures of § 3 First to be a compulsory substitute for economic self-help, not merely a voluntary alternative to it. For this reason, the Court concluded that the NorrisLaGuardia Act, 29 U. S. C. §§ 101-115, was not a bar to injunctive relief against strikes called in support of grievance disputes which had been submitted to the National Railroad Adjustment Board.[11]
*40 It is against this pattern of decisions that we must evaluate the petitioners' claim that the District Court in the present case was wrong in enjoining the threatened strike. The claim, simply stated, is that the power to issue injunctions recognized by the Chicago River decision is limited to those situations in which a strike is called during the proceedings before the Adjustment Board. Once a favorable award has been rendered, say the petitioners, the union becomes free to enforce the award as it will by invoking the judicial enforcement procedures of § 3 First (p), or by resorting to economic force. The right to strike, it is argued, is necessary to achieve "the congressional policy of requiring carriers and their employees to settle grievances by the collective bargaining process."
The broad premise of the petitioners' argumentthat Congress intended to permit the settlement of minor disputes through the interplay of economic forceis squarely in conflict with the basic teaching of Chicago River. After a detailed analysis of the historic background of the 1934 Act, the Court there determined that "there was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field." 353 U. S., at 39.
The petitioners' narrower argumentthat, at the least, strikes may be permitted after the Adjustment Board makes an awardis likewise untenable under the circumstances of this case. We do not deal here with nonmoney awards, which are made "final and binding" by § 3 First (m).[12] The only portion of the award which presently remains unsettled is the dispute concerning the *41 computation of Humphries' "time lost" award, an issue wholly separable from the merits of the wrongful discharge issue. This, then, is clearly a controversy concerning a "money award," as to which decisions of the Adjustment Board are not final and binding.[13] Instead, the Act provides a further step in the settlement process. If the carrier does not comply with the award, or with the employee's or union's interpretation of it, § 3 First (p) authorizes the employee to bring an action in a Federal District Court to enforce the award.[14] The lawsuit is to "proceed in all respects as other civil suits," but the findings and order of the Adjustment Board are to be regarded as "prima facie evidence" of the facts stated in the complaint. The employee is excused from the costs of suit, and, in addition, is awarded attorney's fees if he prevails. The total effect of these detailed provisions is to provide a carefully designed procedure for reviewing money awards, one which will achieve the reviewing function without any significant expense to the employee or his union. See Washington Terminal Co. v. Boswell, supra.
The express provision for this special form of judicial review for money awards, both in subsection (m) and again in subsection (p), makes it clear that Congress regarded this procedure as an integral part of the Act's grievance machinery. Congress has, in effect, decreed a two-step grievance procedure for money awards, with the first step, the Adjustment Board order and findings, serving as the foundation for the second. Money awards against carriers cannot be made final by any other means. To allow one of the parties to resort to economic self-help at this point in the process would violate this direct statutory command. It would permit that party to withdraw at will from the process of settlement which Congress has *42 expressly required both parties to follow. In addition, it would obviously render the earlier parts of the grievance procedure totally meaningless.
A strike in these circumstances would therefore be no less disruptive of the explicit statutory grievance procedure than was the strike enjoined in the Chicago River case. Consequently, the reasons which, in that case, required accommodating the more generalized provisions of the Norris-LaGuardia Act apply with equal force to the present case.[15] We hold that the District Court was not in error in issuing the injunction.
Affirmed.
MR. JUSTICE BLACK dissents.
MR. JUSTICE GOLDBERG, with whom MR. JUSTICE DOUGLAS joins, dissenting.
This Court's decision in the Chicago River case, Trainmen v. Chicago R. & I. R. Co., 353 U. S. 30, holds that strikes are excluded pending grievance proceedings over "minor disputes" before the Adjustment Board. Though this is all that Chicago River holds, the Court today impliedly reads it to mean and, indeed, there is language in Chicago River to the effect that Congress is to be taken as having elected in favor of a comprehensive and wholly exclusive system of compulsory arbitration and as having outlawed all use of economic force in the form of a strike at any stage of a "minor dispute" which is subject to consideration by the Adjustment Board. The logic of Chicago River is that "final and binding" awards of the Adjustment Board are enforceable in favor of, or against, either the employer railroad, the union, or the grievant employee in the federal courts. Given the premises of Chicago River, it must follow that such enforcement proceedings are governed by federal law as declared by *43 this Court in cases such as Steelworkers v. American Mfg. Co., 363 U. S. 564, Steelworkers v. Warrior & Gulf Co., 363 U. S. 574, and Steelworkers v. Enterprise Corp., 363 U. S. 593, and, of course, that the merits of such awards are not subject to de novo consideration upon a petition for judicial enforcement. See Machinists Assn. v. Central Airlines, 372 U. S. 682.
Here, however, unlike Chicago River, the Adjustment Board proceedings have ended; moreover, we are dealing not with a nonmoney award which is made specifically "final and binding" by the statute, but with a money award which, as the majority recognizes, is governed by different considerations and is treated differently in the statute itself. A money award by the Board is expressly declared by the Act not to be "final and binding." The enforcement machinery contained in subsection (p) of the Actwhich the Court's opinion inferentially suggests is confined to money awards, and which I would expressly declare to be so limited[1]contemplates for such awards not that limited type of review applicable to "final and binding" nonmoney awards, but a de novo *44 trial before the court, subject only to the limitation, as the statute requires, that the findings of fact of the Board shall constitute "prima facie" evidence. Under such circumstances, the logic of Chicago River in excluding strikes in favor of an exclusive scheme of "compulsory arbitration" seems to me to have no application, for here we are dealing with nonfinal and nonbinding awards, the direct antithesis of a compulsory arbitration scheme.
In addition, the Court's opinion leads to what seems to me to be a wholly anomalous result plainly never intended by Congress. What was merely expressed as dicta in Union Pac. R. Co. v. Price, 360 U. S. 601, is apparently reinforced by today's holding. In Price, the Court said, though the question was not before it, that a strike against an Adjustment Board award denying a money claim of a grievant could be enjoined in the federal courts under the rationale of Chicago River. See 360 U. S., at 611, n. 10. The Court here holds that a strike to enforce a money award favorable to the claimant is forbidden even when the carrier refuses to abide thereby. In so holding, the Court cites Price with apparent approval and its language supports the result declared by the Price dicta. Thus, as of today, it appears even more clearly that a grievant filing a money claim which is denied by the Adjustment Board is finally bound by the result and may neither bring an independent suit on his claim (the holding of Price[2]), nor, presumably, utilize economic pressure, i. e., the strike, in support of his claim (the purport of the Price dicta and the thrust of today's holding), nor even seek further judicial review of the merits of his claim since the literal language of subsection (p) applies only to awards in the claimant's favor. The carrier will have no reason to seek further judicial review because the award is favorable to it and both the unsuccessful grievant and the union are *45 without effective means to prevent its enforcement. Thus, under today's opinion and the prior cases cited therein, the grievant whose money claim is denied by the Board is wholly without further remedy or recourse.
Such complete foreclosure of a losing money claimant would be less objectionable were it not for the wholly disparate consequences obtaining as a result of today's decision when it is the carrier who loses on a money claim before the Board. If this occurs, the carrier is free to refuse to comply, as it did here; since today's opinion forecloses other avenues of relief to the successful grievant and his union, the carrier, by such recalcitrance, can compel a suit to enforce the award under subsection (p), which requires an entire retrial of the issues in court. During this lengthy procedure and, presumably, even at its conclusion, the grievant and the union will be left without economic or other recourse. The net result, therefore, is that on all money claims, the award of the Board is "final and binding," and not subject to further review or other challenge, if the claimant loses, but it is subject to de novo review and trial at the sole behest of the employer, if the employer loses. And in either case, apparently, the union is completely foreclosed even from using its most traditional weapon, the strike. I cannot believe that Congress intended such an unevenhanded application of the statute. Nor can I believe, as the Court holds, that Congress could have contemplated that the protection of the right to strike afforded by the Norris-LaGuardia Act was being rescinded in favor of such an inadequate and unfair procedure as the Court declares the Act to have created.
Absent a willingness to permit equally broad de novo review to a grievant whose money claim is denied by the Board,[3] a reading of the statute which admittedly seems contrary to literal words of subsection (p), the only interpretation *46 which provides a semblance of fairness in this situation is one which interprets congressional intent to be that, in money-claim cases at least, the right to strikewhile perhaps suspended during Adjustment Board proceedingsis available either if the Board decides for the claimant and the carrier does not comply, or if the Board decides for the carrier and the claimant does not acquiesce. This at least would not leave the entire balance in money cases in favor of the carrier.
The suggested result is in no way foreclosed by Chicago River, which did not treat of the difference between enforcement of money and nonmoney awards once made, nor by Price, since that case did not deal with the right to strike, and is distinguishable on the ground that there, having once resorted to the Adjustment Board, the losing grievant could not, under traditional election-of-remedy principles, relitigate the same issues afresh by bringing an independent, unrelated common-law action in another forum.[4]
My ultimate view, therefore, is that Congresswhatever its intent with respect to impliedly repealing the Norris-LaGuardia Act in nonmoney cases in which the Board's decision is expressly made final and binding cannot fairly be deemed to have intended such a repeal in money-award cases, in which the Board's decisions are expressly not final and binding. The legislative history is not merely uninstructive as to today's result; it clearly demonstrates that Congress never focused on or considered the problem here raised, or even recognized the anomaly today's opinion in part effects and in part portends. Notwithstanding, the Court has read Congress as intending allowance of what in Chicago River was *47 described as an injunction which "strips labor of its primary weapon without substituting any reasonable alternative." 353 U. S., at 41. To impute so drastic a result without any clear indication that it was intended seems to me to be unwarranted.
I reach these conclusions reluctantly since I believe that arbitration of grievances is, in general, a salutary policy in the field of labor-management relations and contributes substantially to industrial peace. Wholly apart from questions as to the general desirability of compulsory arbitration, the results flowing from Chicago River would, in these terms, be commendable, assuming that the normally cumbersome and slow procedures of the Adjustment Board could be expedited to achieve the efficacy and efficiency typical of private labor arbitrations and essential to success of the process. The court procedure under subsection (p) of the Act, which today is made an integral, if not mandatory, part of the statutory grievance machinery, will, however, only increase the already undue delay in resolution of grievances.[5] Moreover, the de novo nature of the requisite court trial on review under subsection (p) *48 runs directly contrary to the best view of the treatment to be judicially accorded such awards. See, e. g., Steelworkers v. Enterprise Corp., supra, 363 U. S., 596-599. These latter considerations do not themselves compel my conclusion here, however, for standing alone they are the result of policy determinations which, in this instance, either have already been made by, or are more properly committed to, Congress as direct consequences of the literal statutory scheme. They are, nonetheless, relevant factors in appraising the propriety and wisdom of the Court's construction of the statute and its estimate of the intention of its framers.
Thus, with all deference, I must respectfully dissent from today's opinion since, though neither mandated by this Court's prior holdings nor supported, much less compelled, by specific congressional intent, it creates additional exceptions to the Norris-LaGuardia Act protections and does so in a fashion which effects, in my view, an unfair imbalance, if not outright clear advantage, in favor of the carrier and against the employee and his union.
NOTES
[1] "(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 45 U. S. C. § 153 First (i).
[2] "(p) If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board." 45 U. S. C. § 153 First (p).
[3] There can be no doubt that the controversy over the amount of the "time lost" award is a minor dispute, because it involves "the interpretation or application" of the collective agreement between the railroad and the union. See note 1, supra. See also, Elgin, J. & E. R. Co. v. Burley, 325 U. S. 711; Trainmen v. Chicago R. & I. R. Co., 353 U. S. 30.
[4] 48 Stat. 1185, 1189 (1934).
[5] 44 Stat. 577, 578 (1926).
[6] 45 U. S. C. § 153 First (a)-(h).
[7] See note 1, supra.
[8] 45 U. S. C. § 153 First (l).
[9] "(m) The awards of the several divisions of the Adjustment Board shall be stated in writing. A copy of the awards shall be furnished to the respective parties to the controversy, and the awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award. In case a dispute arises involving an interpretation of the award, the division of the Board upon request of either party shall interpret the award in the light of the dispute." 45 U. S. C. § 153 First (m).
[10] "(o) In case of an award by any division of the Adjustment Board in favor of petitioner, the division of the Board shall make an order, directed to the carrier, to make the award effective and, if the award includes a requirement for the payment of money, to pay to the employee the sum to which he is entitled under the award on or before a day named." 45 U. S. C. § 153 First (o).

The language of § 3 First (p) is set out in note 2, supra.
[11] "[The Norris-LaGuardia Act was designed primarily] to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital. Rep. LaGuardia . . . recognized that the machinery of the Railway Labor Act channeled these economic forces, in matters dealing with railway labor, into special processes intended to compromise them. Such controversies, therefore, are not the same as those in which the injunction strips labor of its primary weapon without substituting any reasonable alternative." 353 U. S., at 40-41. Cf. Manion v. Kansas City Terminal R. Co., 353 U. S. 927, which held that injunctive relief is not available if the processes of the Railway Labor Act have not actually been invoked. Compare Sinclair Refining Co. v. Atkinson, 370 U. S. 195, 210-212.
[12] See note 9, supra.
[13] See note 9, supra.
[14] See note 2, supra.
[15] See note 11, supra.
[1] A common sense and practical reading of the statutory provisions seems to me to compel the conclusion that subsection (p) is confined in its application to money claims. Subsection (m) makes all nonmoney awards "final and binding" and any reading of subsection (p) which allowed de novo review of the merits of such awards would be directly contradictory to the effect expressly accorded to them. Moreover, subsection (o) provides that if the claimant wins, the Board shall enter an "order, directed to the carrier, to make the award effective" and that, in cases involving a money award, such order shall require payment by a day certain. Such detailed direction with respect to the money-award order would appear exclusively complementary to the provision in subsection (p), the immediately succeeding section, which provides for the de novo review only in cases in which a losing carrier does not comply with the award "within the time limit in such order." (The relevant subsections of the Act are set out in notes 2, 9, and 10, of the Court's opinion, ante, pp. 35, 37.)
[2] See also Pennsylvania R. Co. v. Day, 360 U. S. 548.
[3] Cf. United States v. Interstate Commerce Comm'n, 337 U. S. 426.
[4] In fact, the manner in which the Court in Price distinguished its earlier decision in Moore v. Illinois Central R. Co., 312 U. S. 630, suggests this very rationale. See 360 U. S., at 609, n. 8.
[5] While the Adjustment Board handles and disposes of an impressive number of cases each year, the backlog of pending disputes is immense. During its 1962 fiscal year, a total of 997 cases were disposed of by decision and 383 cases were withdrawn. During the same period, however, 1,873 new cases were docketed. The total of 1,380 cases thus removed from the docket during the year still fell almost 500 cases short of equalling the number of new grievances filed. At the end of the year, the Board had still pending before it some 6,461 cases, of which only 1,679 had been heard. By way of comparison, though there were 4,948 cases pending at the end of fiscal year 1958, only 415 of these had not been heard. In only one of the past five fiscal years has the Board even come close to maintaining an equilibrium in its backlog by being able to dispose of almost as many cases as were docketed during the period. Twenty-eighth Annual Report of the National Mediation Board for fiscal year ended June 30, 1962, pp. 59, 86.