UNITED TRANSPORTATION UNION, GENERAL COMMITTEE OF ADJUSTMENT, SWITCHMEN–BURLINGTON NORTHERN, INC., Plaintiff,

v.

BURLINGTON NORTHERN, INC., a corporation, Defendant.

No. 4–71 Civ. 297.

United States District Court,
D. Minnesota,
Fourth Division.

April 18, 1972.

Patrick J. Foley, Rerat, Crill, Foley & Boursier, Minneapolis, Minn., for plaintiff.

James R. Walker and Barry McGrath, St. Paul, Minn., for defendant.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

On November 23, 1971, this matter was heard before this Court on a motion for a preliminary injunction brought on behalf of the plaintiff and on defendant's motion to dismiss the complaint. At that time it was stipulated that the disposition of the motion for a preliminary injunction should stand as and for a trial on the merits of the question of plaintiff's entitlement to a permanent injunction. Based on the pleadings, affidavits, testimony and arguments of counsel the Court enters the following memorandum and order.

This case arises under the Railway Labor Act, 45 U.S.C. § 151 et seq., jurisdiction founded upon 28 U.S.C. §§ 1331, 1337, 2201, and 2202. Plaintiff has its principal place of business at Suite 410, American National Bank Building, St. Paul, Minnesota. Defendant is a common carrier engaged in interstate commerce, incorporated in the State of Delaware with its principal place of business at 176 East Fifth Street, St. Paul, Minnesota.

The plaintiff represents switchmen formerly employed by The Great Northern Railway Company, a predecessor in interest to the defendant Burlington Northern, Inc., and now employed by the defendant. The predecessor union in interest to the United Transportation Union, the Switchmen's Union of North America, entered into a certain collective bargaining agreement with Great Northern Railway Company. This agreement, effective September 1, 1957, continues in effect to the present time and is binding upon the parties to the instant suit. The controversy in this case centers around the overtime rate of pay that switchmen are entitled to when they are called to work a successive shift or "trick" with a different shift or with a different crew after their own regularly scheduled 8-hour shift. The provisions of the collective bargaining agreement relevant to this case are:

Rule 2. Basic Day. Eight hours or less shall constitute a day's work for switchmen.

Rule 3. Assigned Hours. Switchmen shall be assigned for a fixed period of time, which shall be the same hours daily, for all regular members of the crew. So far as practicable, assignments shall be restricted to eight hours' work.

Rule 7. Overtime. OVERTIME-REGULAR MEN. Except when changing off where it is the practice to work alternately days and nights for certain periods, working through two shifts to change off, or where exercising seniority rights from one assignment to another, or when extra men are required by schedule rules to be used, all time worked in excess of eight (8) hours continuous service in a twenty-four (24) hour period shall be paid for as overtime, on the minute basis at one and one-half (1½) times the hourly rate. This rule applies only to service paid on an hourly or daily basis, and not to service paid on mileage or road basis. This rule is subject to Decisions on Questions 119 and 125 of interpretation No. 1 to Supplement 16 to General Order No. 27, U.S.R.R.A., as follows:

QUESTION 119. What compensation should be allowed for additional service where a crew is regularly assigned to work 12 midnight to 8:00 A.M. and (service performed not affected by exceptions outlined in this rule), (a) Is required to cover the third shift on the same day—4:00 P.M., to 12 midnight? (b) Is required in an emer-

gency to work 8:30 A.M. until 11:30 A.M.? (c) Is required in an emergency to work 8:00 P.M. to 12 midnight (four hours) on the same day? (d) Is given 48 hours notice and assignment is moved up an hour starting at 11:00 P.M. and being relieved at 7:00 A.M. and consequently in the 24-hour period works nine hours, but not more than eight hours on a shift?

DECISION. (a) Eight hours at time and one-half. (b) Eight hours at time and one-half. (c) Eight hours at time and one-half. (d) On account of complying with the 48-hour provision, which makes it permissible to change beginning time, crews only entitled to a minimum day.

Rule 8. Size of Crews. A yard crew shall consist of not less than one foreman and two helpers.

Rule 11. Regular Assignment. (a) Regularly assigned switchmen, as designated in Rule 10(a), means switchmen assigned on bulletin or established by the exercise of seniority rights to a regular shift, or to the employee filling such assignment during the incumbent's absence.

Rule 20. Bulletins. (c–2) Effective November 1, 1957, regularly assigned switch and transfer engines will be bulletined for five (5) days' service per week, and will be paid the days of the assignment as bulletined. . . .

The rules under the above schedule, according to the plaintiff, provide that each employee's day's work is an eight-hour day. Under the rules the defendant may request an employee to work on a different shift or with a different crew after the completion of his regularly scheduled 8-hour shift. The plaintiff further alleges that when the defendant calls an employee to work beyond his eight hours with a different crew or on a different shift, the employee is entitled to a new day's pay, a minimum of eight hours of pay at time and one-half for all eight hours as the overtime work is immediately following or within a 24-hour period of his original eight-hour day. The plaintiff contends that this not only is embodied within question and decision #119 of the agreement but that it has been the custom and practice within the industry for switchmen to receive such overtime pay.

The defendant however, alleges that when a man refused to work a full second shift (eight hours) or was unable to work because of illness or for any reasons of his own he was not paid for any part of the second shift which he did not work, that the collective bargaining agreement when viewed in its entirety contemplates the availability of switchmen for an entire eight-hour overtime shift in order to qualify for the full overtime pay rate, and that its actions in this matter are in accordance with said collective bargaining agreement.

An amendment to the Hours of Service Act was the legal impediment around which this controversy arose. With the enactment on December 26, 1969 of Public Law 91–169, 45 U.S.C. §§ 61–64, it became unlawful as of December 26, 1970 for any employee in connection with train movements, e. g. a switchman, to work for more than 14 continuous hours. 45 U.S.C. § 62 states, in part (as amended):

§ 62. Employees' hours of service— Limitations

(a) It shall be unlawful for any common carrier, its officers or agents, subject to sections 61 to 64(b) of this title—

(1) to require or permit an employee, in case such employee shall have been continuously on duty for fourteen hours, to continue on duty or to go on duty until he has had at least ten consecutive hours off duty, except that, effective upon the expiration of the two-year period beginning on the effective date of this paragraph, such fourteen-hour duty period shall be reduced to twelve hours; or

(2) to require or permit an employee to continue on duty or to go on duty when he has not had at least

eight consecutive hours off duty during the preceding twenty-four hours.

. . .

The plaintiff union maintains that even though a switchman may not work for more than 14 continuous hours, or six hours overtime, the individuals called to do so should still receive overtime pay for a full eight-hour day. Since the effective date of the statutory limitation of 14 hours of service, December 26, 1970 to the time of hearing before this Court, there have been approximately 60,000 switch engine "tricks" or shifts in the former Great Northern District of the defendant with approximately 12–18 claims filed with defendant's division superintendents seeking overtime pay at time and one-half for the entire second eight-hour shift, although actual work time on that shift was limited to six hours. [the first such refusal was February 25, 1971].

The plaintiff union alleges that the refusal by the defendant carrier, since the amendment to Hours of Service Act, to pay a full day's overtime amounts to a unilateral change in the rate of pay in violation of 45 U.S.C. §§ 152 Seventh, 155, and 156, which read as follows:

Title 45, United States Code, Section 152 provides in part as follows:

Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

. . .

Title 45, United States Code, Section 156 provides in part as follows:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions. . . . In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Me-

diation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten (10) days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board. . . .

Title 45, United States Code, Section 155 provides in part as follows:

First. The parties, or either party, to a dispute between an employee or a group of employees and the carrier may invoke the services of the Mediation Board in any of the following cases:

a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference. . . .

The Union contends that the above mediatory procedures must be adhered to as the instant dispute falls within the "major dispute" provisions of the Railway Labor Act and seeks to 1) enjoin the railroad from changing the overtime rate of pay without complying with the above provisions, and 2) restore the "status quo" as it existed before the Hours of Service amendment. See Detroit & Toledo Shore Line R. R. v. United Transportation Union, 396 U.S. 142, 149 n. 14, 150, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); United Transportation Union, Local 63E v. Penn Central Co., 443 F.2d 131, 134–136 (6th Cir. 1971).

The defendant carrier, on the other hand, asserts that this dispute comes under the minor dispute provision of 45 U.S.C. § 153 First (i), which states:

(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending

and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

The defendant railroad has moved to dismiss on the ground that this court does not have jurisdiction over the subject matter since the National Railroad Adjustment Board has exclusive primary jurisdiction of minor disputes.

Neither party to this action has given "Section 6" notice of an intended change in the collective bargaining agreement pursuant to 45 U.S.C. § 156, nor have they instituted negotiation and conference proceedings or submitted their case to the National Railroad Adjustment Board pursuant to any other provisions of the Railway Labor Act.

The narrow legal question presented to this Court is whether the instant dispute is a minor dispute or a major dispute. The basic distinctions between the two classes of disputes were drawn in the oft cited case of Elgin J. and E. R. Co. v. Burley, 325 U.S. 711, 723–724, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886:

> The first [major dispute] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
>
> The second class [minor dispute], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.
>
> In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.
>
> The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so.

Several courts have termed these distinctions as being a "question of degree", Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 33 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963), as a "fine line", Itasca Lodge 2029, etc. v. Railway Express Agency Inc., 391 F. 2d 657, 665 (8th Cir. 1968) or "more easily stated than applied," Southern Ry. v. Brotherhood of Locomotive Fire & Eng., 127 U.S.App.D.C. 371, 384 F.2d 323, 327 (1967), however it is clear that

here both parties have predicated their claims on the existing collective bargaining agreement or on long standing practices in the industry, and that this dispute is a minor dispute. See United Indus. Workers of Seafarers Int'l. Union, etc. v. Board of Trustees of Galveston Wharves, 351 F.2d 183, 188–191 (5th Cir. 1965); cf. Missouri-Illinois R. Co. v. Order of Railway Conductors, 322 F. 2d 793, 797 (8th Cir. 1963). This Court is of the opinion that here there is not mere *ipse dixit* characterization, that is the carrier is not using broad brush strokes to conceal imperfections that would amount to a blanket application of nonviable principles governing the question of the category into which this dispute should fall. The carrier's position that the collective bargaining agreement provisions and custom and practice in the industry require the availability of a switchman for a full eight-hour overtime shift is neither obviously insubstantial, Southern Ry. Co. v. Brotherhood of Locomotive Fire & Eng., 127 U.S.App.D.C. 371, 384 F.2d 323, 327 (1967), nor can it be said that its position is "nowise contemplated or arguably covered by the agreement." Switchmen's Union of North America v. Southern Pacific Company, 398 F.2d 443, 447 (9th Cir. 1968).

> The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance. . . .
>
> [W]here the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute. We think this is such a case. [Citations omitted] id.

See Northwest Airlines, Inc. v. Air Line Pilots Ass'n. Inter., 442 F.2d 246, 248 (8th Cir. 1970); Railway Labor Executives Ass'n. v. Atchison, T. & S. F. Ry. Co., 430 F.2d 994, 996 (9th Cir. 1970).

■ Plaintiff also urges that injunctive relief be issued to restore the status quo as it existed before February 25, 1971, the date of the defendant's first refusal to pay the full eight-hour overtime rate. This Court recognizes that it has the discretionary power to grant injunctive relief to preserve the jurisdiction of the Adjustment Board before the parties have submitted the dispute to that body. See Itasca Lodge 2029, etc. v. Railway Express Agency Inc., 391 F.2d 657 (8th Cir. 1968); Brotherhood of Railroad Carmen of America Local No. 429 v. Chicago and N. W. Ry. Co., 354 F.2d 786 (8th Cir. 1965). However, here a determination of whether or not the defendant has made a unilateral change in breach of the collective bargaining agreement and also whether or not such change was permissible pursuant to said agreement would require this Court to assume the posture of a substitute Adjustment Board and to render an opinion on the provisions of the contract in light of the Hours of Service amendment mandating a limitation of time on duty. Therefore, this Court is of the opinion that injunctive relief cannot be granted as that would require an interpretation of the collective bargaining agreement and thus involve rendering a decision on the merits of this dispute, something that must be left for the expertise of the Adjustment Board itself. Brotherhood of Loco. Eng'rs v. Louisville & Nashville R. R., 373 U.S. 33, 38–40, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); Pennsylvania R. R. v. Day, 360 U.S. 548, 550–553, 79 S.Ct. 1322, 3 L.Ed.2d 1422 (1959); Slocum v. Delaware, L. & W. R. R., 339 U.S. 239, 243–245, 70 S.Ct. 577, 94 L.Ed. 795 (1950); Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 566–568, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Itasca Lodge 2029, etc. v. Railway Express Agency Inc., 391 F.2d 657, 661 (1968); cf. Brotherhood of Loco. Eng'rs v. Missouri-Kan.-Tex. R. R., 363 U.S. 528, 533–534, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). In addition, the Adjustment Board provides an adequate remedy at law for the disposition of this matter and no irreparable harm has

been demonstrated by the plaintiff. See Brotherhood of Loco. Eng'rs. v. Missouri Kan.-Tex. R. R., 363 U.S. 528, 533–535, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); Order of Ry. Conductors v. Pitney, 326 U.S. 561, 567, 66 S.Ct. 322, 90 L.Ed. 318 (1946); United Transportation Union v. Burlington Northern Inc., 458 F.2d 354 (8th Cir. 1972); Northwest Airlines, Inc. v. Air Line Pilots Ass'n. Inter., 442 F.2d 246, 250 (8th Cir. 1970) (Bright, J., concurring).

Accordingly, upon a finding that this action involves a minor dispute over which the National Railroad Adjustment Board had exclusive, primary jurisdiction, Brotherhood of Locomotive Engineers v. Louisville and Nashville R. R., 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963), plaintiff's motion is denied and defendant's motion to dismiss is granted.

It is so ordered.