United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-2358

_____

Brotherhood of Locomotive            *
Engineers International Union;       *
Kerry G. Timmons; James C.           *
Schlereth,                           *
                                     *
        Plaintiffs - Appellees,      *   Appeal from the United States
                                     *   District Court for the
            v.                       *   Eastern District of Missouri.
                                     *
Union Pacific Railroad Company,      *
                                     *
        Defendant - Appellee,        *
                                     *
United Transportation Union,         *
                                     *
        Defendant - Appellant.       *

_____

Submitted:  February 14, 1997

Filed:

_____

Before HANSEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    MELLOY,[1] District Judge.

_____

_____

    [1]The Honorable Michael J. Melloy, Chief Judge, United States District Court for
the Northern District of Iowa, sitting by designation.

HANSEN, Circuit Judge.

The United Transportation Union (UTU) appeals from the district court's[2] grant of the plaintiffs' and the Union Pacific Railroad Company's (Union Pacific) motions for summary judgment. In its order, the district court vacated a decision of Public Law Board 4478 on the basis that it violated the Railway Labor Act (RLA), 45 U.S.C. §§ 151-88 (1994). We affirm.

**I.**

In this case, we address the question of what participatory rights in an arbitration proceeding exist under the RLA when it involves two labor unions and a rail carrier. Before turning to our discussion of the proceedings at issue here, we first place the dispute in its factual context.

The twentieth century has seen substantial changes in the railroad industry, not the least of which is the changing type of skilled work available for railroad workers. In the glory days of the steam-powered railroad industry, a fireman tended the fire in the steam locomotive. In addition, the fireman learned the skills and duties of the engineer, the person who actually operated the locomotive. Eventually, a fireman could qualify to obtain a promotion and become an engineer. Each craft existed separately, and while each craft had its own union, a single worker could be qualified both as a fireman and as an engineer and occupy a position on the seniority lists of each craft.

The relationship between the positions of fireman and engineer lent itself to a system of "ebb and flow" with employees low on the engineer seniority list moving

_____

[2]The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

2

between positions as engineer and fireman as the demand for engineers fluctuated. This system was governed by virtually identical "mileage regulations" in the collective bargaining agreements (CBAs) between the railroads and the labor organizations representing the two crafts. The mileage regulations set forth a benchmark of average monthly miles worked by engineers. If the engineers' average miles dipped below the contractual benchmarks, some engineers with less seniority would ebb to a fireman position. Firemen with the least seniority would be furloughed. When the mileage exceeded reinstatement benchmarks and more engineers were needed, qualified engineers working as firemen would flow back into the newly available engineer positions, and furloughed firemen would be recalled to work.

The flexible ebb and flow system faltered when diesel locomotives came into existence. As diesel locomotives replaced the steam locomotives, the railroads' need for firemen disappeared. The railroads began to eliminate fireman positions through attrition, and the remaining firemen began to perform more "hostler" work, consisting of fueling and servicing the engines and moving engines within the rail yards. When work was slow, engineers still ebbed down, displacing firemen who were moved to performing more hostler work. But when business picked up and a rail carrier needed more engineers, the qualified firemen who could work as engineers were too often either on duty as firemen, or resting from work as firemen, or hostling in far-off rail yards and not immediately available for engineer duty.

In an attempt to solve this problem, several rail carriers, including the Union Pacific, jointly negotiated a mediation agreement with the UTU under which the carriers could eliminate the firemen through attrition and could recruit additional engineers from the class of workers known as "trainmen," a position that had not become outdated with the advent of the diesel locomotives. The mediation agreement was not, however, a perfect solution.

The Union Pacific also agreed with the engineers' labor organization, the Brotherhood of Locomotive Engineers (BLE), to create "extra boards" containing lists of available engineers. However, because these extra boards were also governed by mileage regulations, under which engineers ebbed down to firemen (which still involved the less desirable hostling work), the problem of the availability of engineers upon demand remained.

Finally, the Union Pacific decided it needed a pool of engineers in reserve who would not ebb down to firemen and who would be available regardless of how many miles they worked. In 1986 and 1987, the Union Pacific and the BLE entered into several agreements, establishing "reserve boards" of engineers.[3] Unlike the regular extra boards, the reserve boards were not subject to the mileage regulations.

The UTU (the labor union representing the firemen) believed the BLE and the Union Pacific's agreements to create the new reserve boards violated the mileage regulation provisions in the firemen's CBA between the UTU and the Union Pacific. These mileage regulation provisions were virtually identical to the mileage regulations in the engineers' CBA between the BLE and the Union Pacific. The UTU contended that its CBA between the firemen and the Union Pacific prohibited the creation of engineer positions in a manner contrary to the mileage regulations which were common to both CBAs, and also restricted the number of engineer positions that could exist in any seniority district. The UTU therefore objected to the creation of the new reserve boards created without the UTU's involvement or concurrence. The Union Pacific responded that the agreements establishing the new reserve boards were proper and valid and that the BLE (not the UTU) had the exclusive authority to enter into

---

[3]These boards are sometimes referred to as "guaranteed extra boards" or "supplemental extra boards." (Union Pacific App. at 37, 41-44, 51-59.) For consistency, we will call them "reserve boards."

4

agreements with the Union Pacific regarding the creation of engineer positions and the conditions surrounding those positions.

When the UTU and the Union Pacific were unable to resolve their differences amicably, the UTU referred the matter to arbitration in accordance with Section 3 of the RLA, 45 U.S.C. § 153 Second (second paragraph).  On January 26, 1988, the UTU and the Union Pacific entered into an agreement establishing a public law board to answer the following question in issue:

> Under the provisions of the Labor Contract between the [UTU] and the [Union Pacific] . . . , may [Union Pacific] enter into agreements with another labor organization that have for their purpose the establishment of extra boards for engineers (including, but not limited to reserve, auxiliary, and guaranteed boards) which are not regulated in accordance with the provisions of the [UTU] Agreement or are established to create engineer positions that are not called for under the mileage regulations and/or the requirements of the service as contemplated and required by the rules of the [UTU]?

(Appellant's App. at 85.)  The parties established Public Law Board 4478 (the Criswell Board), consisting of two partisan members (one selected by the UTU and one by the Union Pacific) and one neutral member, John B. Criswell.

Upon notification in February 1988 of the proposed arbitration, the then-chairman of the BLE requested leave to participate as an "interested third party" in the event that the matter did indeed proceed to arbitration.  The Union Pacific replied, noting that the BLE appeared to have a third party interest in the suit and stating that it would keep the BLE informed of developments in connection with the dispute.  The UTU acquiesced in third party status for the BLE without objection.

5

The parties took no further action regarding the arbitration before the Criswell Board, but instead turned their attention to another dispute between them that had arisen out of the merger between the Union Pacific and another rail carrier. This dispute resulted in the creation of yet another public law board, the LaRocco Board. The configuration of the LaRocco Board included the BLE and the Union Pacific, this time holding opposing views and each represented by a board member, and the UTU appeared as an interested third party. The LaRocco Board issued its decision in January 1990 and ruled in favor of the BLE, holding that the Union Pacific could not reduce or discontinue its use of the new reserve boards in certain seniority districts.

The Criswell board did not meet until June 1990. By that time, as a result of the dispute between the Union Pacific and the BLE in the LaRocco arbitration, the BLE no longer felt comfortable with just "third party status" before the Criswell Board. The BLE no longer trusted that the Union Pacific would adequately advocate the validity of the agreements between the BLE and the Union Pacific creating the new reserve boards. The BLE was concerned that the Union Pacific could avoid the intended effect of the LaRocco award if the new reserve board agreements were found invalid by the Criswell Board. When the Criswell Board convened, but before the board met in executive session and before the board voted on the dispute, the BLE's General Chairman appeared on the BLE's behalf and requested that the BLE be permitted to participate fully in the arbitration, not merely as an "interested third party." The BLE argued that because its agreements with the Union Pacific were at stake, the BLE should have a voting member on the board, should participate in choosing the neutral member of the board, and should participate in formulating the question at issue. The BLE also argued that the Criswell Board lacked jurisdiction to decide the question at issue, because the question implicated representational issues, the resolutions of which were in the exclusive jurisdiction of the National Mediation Board.

The neutral arbitrator, Criswell, rejected the BLE's objections and denied the BLE's request to be a full member on the Board. Consequently, the BLE presented its

arguments only as an interested third party, without the right to attend the Board's closed executive session. The Criswell Board issued its award on August 22, 1991, finding that the Union Pacific "may not negotiate with either of the unions separately an agreement which has for its purpose abrogation, change, or evasion of agreements existing with the other." (Id.)

Shortly after the Criswell award was rendered, the BLE and two of its members filed the instant complaint in the United States District Court for the Eastern District of Missouri. The plaintiffs first sought an order enforcing the LaRocco award. They also sought an order vacating the Criswell award based upon lack of jurisdiction and noncompliance with the requirements of the RLA. The UTU filed a cross claim against the Union Pacific, seeking enforcement of the Criswell award. The parties then filed motions for summary judgment. On April 15, 1996, the district court granted the plaintiffs' and the Union Pacific's motions in part, vacating the Criswell award for the board's noncompliance with the RLA. Accordingly, the court denied the UTU's motion to enforce the Criswell award. Also, the court denied without prejudice the plaintiffs' and the Union Pacific's motions seeking enforcement of the LaRocco award, finding (at the parties' suggestion) the issue to be moot. The court did not reach the parties' arguments regarding the Criswell Board's jurisdiction. The UTU now appeals the district court's determination that the Criswell award was rendered in violation of the RLA.

## II.

We review the district court's grant of summary judgment de novo. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

7

Arbitration before a board of adjustment authorized by the second paragraph of 45 U.S.C. § 153 Second, commonly referred to as a public law board (PLB), see 29 C.F.R. § 1207.1 (1997), is a method of resolving minor disputes, that is, "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i); see id. § 153 Second (authorizing arbitration before PLBs "to resolve disputes otherwise referable to the [National Railroad] Adjustment Board" under section 153 First). Congress created this optional mechanism for dispute resolution in a 1966 amendment to the RLA as a result of the backlog of cases then pending before the National Railroad Adjustment Board (NRAB). Douglas L. Leslie, The Railway Labor Act 58-59 (Douglas L. Leslie et al., eds., 1995).

The RLA sets forth the procedure for establishing PLBs. See 45 U.S.C. § 153 Second (second paragraph); 29 C.F.R. § 1207 (1994). Either a union or a rail carrier may request that the other party join in an agreement to establish a PLB to resolve a collective bargaining dispute. The PLB "shall consist of one person designated by the carrier and one person designated by the representative of the employees." 45 U.S.C. § 153 Second. "The members of the board so designated shall determine all matters not previously agreed upon by the carrier and the representative of the employees with respect to the establishment and jurisdiction of the board." Id. If the partisan board members are unable to resolve the dispute, they must attempt to agree to select a neutral board member or request the National Mediation Board to appoint a neutral member who will decide the matter. "Any two members of the board shall be competent to render an award." Id. The PLB's decision is ?final and binding upon both parties to the dispute." Id.

The scope of judicial review of a PLB's decision under the RLA is quite narrow. Awards of PLBs are enforceable in the same manner as are awards of the NRAB. Id. As a general matter, the PLB's findings and its order are conclusive on the parties. 45

8

U.S.C. § 153 First (q); see also Brotherhood of Locomotive Eng'rs v. Louisville & N. R.R., 373 U.S. 33, 39 (1963) (noting Congress intended the remedies provided by these boards "to be the complete and final means for settling minor disputes").  We will set aside a PLB's decision only for (1) failure to comply with RLA requirements, (2) failure to confine itself to matters within its jurisdiction, or (3) fraud or corruption by a Board member.  45 U.S.C. § 153 First (q); Union Pac. R.R. v. Sheehan, 439 U.S. 89, 93 (1978).

The plaintiffs and the Union Pacific maintain that the Criswell Board failed to comply with the requirements of the RLA because the BLE was not allowed to participate in the formulation of the issue, was not allowed to designate a  member of the Board, and consequently was excluded from the executive session of the Board. The UTU argues, however, that the Criswell Board did not violate the RLA because the BLE had entered a binding agreement to participate in the Criswell arbitration only as an interested third party and, alternatively, had waived any right to be a full participant on the board by failing to raise its objections for over two years after the board was established.  The UTU also argues that the BLE had no right under the RLA to participate as a full member of the Board.  The plaintiffs and the Union Pacific counter that the BLE neither entered into a binding agreement to appear only as an interested third party nor waived its right to full participation on the Criswell Board.

## A.  Waiver

We first address the UTU's waiver argument.  The UTU claims the BLE waived its objections by failing to raise them prior to the June 1990 Criswell Board hearing. The parties to an arbitration may waive procedural defects by failing to bring such issues to the arbitrator's attention in time to cure the defects.  This rule applies because "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."  United States v. L. A. Tucker Truck Lines, Inc.,

9

344 U.S. 33, 37 (1952).  Moreover, "[i]t is imperative to an efficient and fair administration of justice that a litigant may not withhold his objections, await the outcome, and then complain that he was denied his rights if he does not approve the resulting decision."  Brotherhood of Ry., Airline, & S.S. Clerks, Freight Handlers, Express & Station Employees v. St. Louis S.W. Ry., 676 F.2d 132, 136 (5th Cir. 1982) (quoting Brotherhood of R.R. Trainmen v. Chicago, Milwaukee, St. Paul & Pac. R.R., 380 F.2d 605, 608-09 (D.C. Cir. 1967); see also Schneider v. Southern Ry., 822 F.2d 22 (6th Cir. 1987) ("It is well-established that parties to an arbitration may waive procedural defects by failing to bring such issues to the arbitrator's attention in time to allow the arbitrator an opportunity to cure the defects.").

The BLE's timing in raising its objections does not constitute waiver.  The BLE presented its objections prior to the Criswell Board's executive meeting and prior to any vote taken by the Board.  Moreover, the record indicates that no activities were undertaken by either the Board or the BLE regarding the dispute prior to the June meeting.  Although the Board was not aware of the BLE's objections until two years after it had been established, this delay is not unreasonable, given that the Board was essentially inactive between the time it was established and the time it met in June 1990.  By the time it did meet, the prior synergism between the BLE and the Union Pacific had dissipated, at least from the BLE's perspective, and the BLE no longer trusted the Union Pacific to vote to uphold the validity of their existing agreements to create the new reserve boards.  When the BLE did present its objections, the arbitrator had ample opportunity to address them and to cure any default.  We therefore conclude that the BLE did not waive its right to object by waiting to do so until the Board met in June 1990.

## B.  Agreement as to Third Party Status

Upon receiving notice of the UTU's and the Union Pacific's arbitration agreement, the BLE expressed its desire to be made an interested third party if

10

arbitration did in fact ensue. The Union Pacific acknowledged the BLE's request and concurred that the BLE had a third party interest in the dispute. The UTU did not respond, evidently acquiescing to the BLE's request. The UTU and the BLE were opposed to each other's position with respect to the issue to be resolved.

The UTU now argues that by requesting third party status, the BLE entered into a binding agreement to appear only as an interested third party, and thereby relinquished its right to claim full membership on the Criswell Board. We respectfully disagree. The correspondence exchanged represents a preliminary understanding that the BLE had a vital interest at stake in the arbitration before the Criswell Board. The parties did not enter into any agreement concerning BLE's role in the arbitration, and no consideration was exchanged. Absent any formal agreement to the contrary, the BLE retained the right to exercise its right to claim full membership on the board.

We note that had the arbitration proceeded in a timely manner, that is without a two-year delay between formation of the board and its convening, the BLE might well have proceeded without objecting to its interested third-party status, thereby waiving its right to full participation on the board. However, because of the BLE's perception that the Union Pacific was now less than enthusiastic in its support of the BLE/Union Pacific agreements at issue, the BLE asserted its claimed right. Absent any formal binding agreement with the BLE to the contrary, the other parties assumed the risk that in allowing two years to pass, the BLE would no longer be satisfied with its third party status at the time the Criswell Board convened.

## C. Right to Full Board Participation

The UTU also argues substantively that the BLE had no right under the RLA to participate as a full member of the Criswell Board. The UTU contends that allowing both unions to designate their own PLB member contravenes the language of the RLA,

11

invites the possibility of a tie vote by creating a four-member board, and stacks the deck against labor organizations.

The plain language of the RLA anticipates a three-member board, consisting of ?one person designated by the carrier and one person designated by the representative of the employees," and one neutral member when the carrier and the union representative are unable to resolve the dispute. 45 U.S.C. § 153 Second (second paragraph). The PLB's decision, rendered by any two members of the board, is to be ?final and binding upon both parties to the dispute." Id. Thus, on its face, the statute anticipates a three-member board which would be upset if a second union with an interest in the dispute were allowed to designate a board member as well.

Nevertheless, we do not write on a clean slate but must consider our prior case law. It is beyond dispute that an interested union has a right to participate in PLB proceedings. See Transportation-Communication Employees' Union v. Union Pacific R.R., 385 U.S. 157 (1966) (holding all interested parties must be notified of an arbitration and afforded a right to participate in the arbitration). See also United Transp. Union v. Burlington N., Inc., 470 F.2d 813 (8th Cir. 1972) [hereinafter BN1] (stating, in a dispute involving the interpretation of a provision common to the CBAs of two unions,?both unions were entitled to participate in any proceedings to determine the meaning of a paragraph common to both [CBAs]"). Certainly, the BLE was afforded the right to participate in the proceedings before the Criswell Board. Key to this appeal, however, is the question of whether that right to participate includes the right to designate a voting board member, a right which the BLE was not afforded. For guidance on this issue, we consider General Comm. of Adjustment v. Burlington N., Inc., 563 F.2d 1279 (8th Cir. 1977) [hereinafter BN2].

In BN2, the dispute arose over the interpretation of a merger protection agreement between the Burlington Northern (BN) and the BLE. The engineers involved in the dispute were members of both the BLE and the UTU, and they asked

12

the UTU to process their grievance against the railroad. The UTU requested a special board of adjustment pursuant to the second paragraph of 45 U.S.C. § 153, Second (a Public Law Board),[4] and the BN objected, arguing that such a board had no jurisdiction over the dispute. Id. at 1281. Nevertheless, the BN agreed to submit the jurisdictional issue to the special board of adjustment, which agreed with the BN that it lacked jurisdiction to interpret the merger agreement. Id. Upon our consideration of the dispute, we emphasized:

> [I]n disputes arising out of collective bargaining agreements, other than merger protective agreements, an employee not only has a right to be represented by the union of his choice but also has a right to have his union representative sit on the arbitration panel deciding the case. The employee has the right even though the contract being construed was negotiated by a rival union and even though precedents established by the rival union and the railroad are to be followed.
>
>     . . . .
>
> An aggrieved employee cannot help but feel that his interests in an arbitration proceeding will be better served if his union representative sits in on the closed door discussions that follow a presentation than if a representative of a union to which he does not belong or to which he has not entrusted the adjustment of his grievance has this privilege.

---

[4]The term ?special board of adjustment" can at times be confusing. A board created pursuant to the second paragraph of 45 U.S.C. § 153, Second, is specifically called a ?special board of adjustment" in that paragraph. In practice, however, the term is usually used to refer to the private ?system, group, or regional boards of adjustment" authorized by the first paragraph of 45 U.S.C. § 153, Second. As we noted earlier, the statutory ?special boards of adjustment" authorized by the second paragraph of the cited section are commonly called ?public law boards" to differentiate them from the private boards authorized by the first paragraph. See Employees Protective Ass'n v. Norfolk and Western Ry., 511 F.2d 1040, 1044 (4th Cir. 1975).

BN2, 563 F.2d at 1284.

This precedent compels us to conclude that the BLE was entitled to participate as a member of the Criswell Board. Our opinions in BN1 and BN2 indicate that both unions have a right to representation on the board where the dispute involves a contract provision common to both unions' CBAs with the same carrier, even if the contract dispute initially arose between the rail carrier and but one of the unions over the contract provision. Our own reading of the statute leaves us somewhat discomforted by this resolution, because the plain language of the second paragraph of 45 U.S.C. § 153 Second seems to envision only a three-person PLB. Nevertheless, because our panel is not at liberty to overrule another panel decision, we are compelled to follow the reasoning of BN1 and BN2, which reasoning indicates that the BLE was not obligated to accept its designation as a third party but had a right to full membership on the Criswell Board.

The BN2 court said that ?[w]e see no practical problems arising from this opinion." 563 F.2d at 1285. The UTU's arguments that a four-person board invites the possibility of deadlock and that such a board may work to the disadvantage of labor organizations highlight some practical problems that might well develop in the future. The answer may lie in our BN1 decision, where we indicated that the dispute in that case, like this one, involving as it did the right of both unions to sit on the arbitration board, would best be decided by the larger National Railroad Adjustment Board, where all the parties are clearly entitled to have board participants, rather than by a PLB. See 470 F.2d 815-16.

Because the district court did not decide the BLE's jurisdictional challenge to the Criswell Board, i.e., that the dispute was a representational one between the two unions addressable only by the National Mediation Board, we decline to address the issue.

### III.

In conclusion, we hold that pursuant to this circuit's existing case law, the BLE had a right under the RLA to full participation on the Criswell Board, which it timely asserted and did not waive. Thus, the district court properly vacated the Criswell Board's decision, and we need not address the parties' arguments concerning the Criswell Board's jurisdiction. Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.