**MISSOURI PACIFIC RAILROAD COMPANY and Missouri-Kansas-Texas Railroad Co., Appellees,**

v.

**UNITED TRANSPORTATION UNION; General Committee of Adjustment; I. Newcomb; K.R. Guethle; R.D. Hogan; W.J. Shelton; Richard L. Helms; T.K. Arthur; R.W. Bretch; R.P. Shocklee; B.J. Bennett; K.R. Menges; J.E. Queathem and K.M. Danneman, Appellants.**

No. 84–1465.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1985.

Decided Jan. 15, 1986.

John O'B. Clark, Jr., Washington, D.C., for appellants.

Gregg H. Levy, Washington, D.C., and H. Kent Munson, St. Louis, Mo., for appellees.

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

Before BRIGHT, Senior Circuit Judge, ARNOLD and BOWMAN, Circuit Judges.

PER CURIAM.

Appellants (United Transportation Union (UTU), its General Committee of Adjustment, and certain of its agents and officers) ask us to vacate the permanent injunction entered by the District Court[1] barring them and those in active concert or participation with them from striking, picketing, and other specified actions. The injunction is limited to actions against Missouri Pacific Railroad Company (MOPAC) as a result of the operation of Missouri-Kansas-Texas Railroad Company (KATY) trains over MOPAC tracks under trackage rights granted to KATY by the Interstate Commerce Commission (ICC). We affirm.

The ICC granted KATY the trackage rights in question, over MOPAC's opposition, as a condition of the ICC's approval of the consolidation of MOPAC with Union Pacific Railroad Company. *See Union Pacific Corp.*, 366 I.C.C. 459 (1982), *aff'd sub nom. Southern Pacific Transportation Co. v. ICC*, 736 F.2d 708 (D.C.Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1171, 84 L.Ed.2d 322 (1985). This consolidation was effected in December 1982. Early in January 1983 KATY, using its own employees, began operations over MOPAC tracks in accordance with the ICC's decision.

UTU sought to have MOPAC require KATY to use MOPAC crews in conducting its trackage rights operations. MOPAC took the position that the ICC had given KATY the right to use its own crews in those operations, and therefore that the matter was out of MOPAC's hands. KATY, for its part, entered into agreements with its own UTU employees to operate its trains in the implementation of its trackage rights over MOPAC tracks as authorized by the ICC. By Mailgram dated March 28, 1983, UTU threatened to strike MOPAC beginning April 4, 1983 if arrangements were not made "to halt this trespass

on our collectively bargained agreements and our seniority by non-Missouri Pacific employees...." Stipulations, Appendix I.

On March 30, 1983, MOPAC initiated the present litigation by filing its complaint under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and the Interstate Commerce Act, 49 U.S.C. § 11341 *et seq.*, seeking declaratory and injunctive relief against the threatened strike. On the same date, the District Court entered a temporary restraining order prohibiting implementation of UTU's strike threat.

On May 20, 1983, UTU filed counterclaims against MOPAC and KATY, which had intervened as a plaintiff, challenging KATY's use of KATY crews to operate KATY trains in trackage rights service. UTU alleged that KATY's trackage rights operations violated an "actual and objective rule and working condition" governing MO-PAC employees, asserting the existence of a requirement that "trains operating over trackage owned by MoPac ... be manned by MoPac crews." Designated Record at 33, ¶¶ 8, 9. UTU also contended that MO-PAC and KATY had violated certain notice and negotiation conditions of the ICC's approval of KATY's trackage rights. Both of these issues, as well as issues raised by MOPAC's complaint, subsequently were presented by UTU directly to the ICC. On June 29, 1983, UTU filed a petition for clarification in which it asked the ICC to rule

> [T]hat its prior orders (1) did not select the forces to perform the trackage rights operations, (2) did not relieve the carriers of their obligations under the Railway Labor Act to avoid unilateral changes of working conditions, and (3) did not relieve the carriers of their obligations to comply with the notice and negotiation provisions of the employee protective provisions imposed in the sub-proceedings at bar to protect the interests of MP employees affected by those transactions.

*Missouri Pacific Railroad Co. v. United Transportation Union*, 580 F.Supp. 1490, 1497 (E.D.Mo.1984).

A few months later the ICC issued a decision rejecting all three of UTU's arguments regarding the selection of crews. *See Denver & Rio Grande Western Railroad Co.*, I.C.C. Finance Docket No. 30,000 (Sub-No. 18 *et al.*) (October 19, 1983) (unpublished), *reprinted in* Brief for Appellants, Appendix I. The ICC held that (a) "trackage rights agreements do not involve a change in UP–MP employees' working conditions," *id.* at 5; (b) MOPAC's employees have "no right to participate in the trackage rights crew selection process," *id.* at 4–5; and (c) pursuant to 49 U.S.C. § 11341, the ICC's approval of KATY's trackage rights applications exempted MO-PAC and KATY from any inconsistent requirements of the Railway Labor Act or their collective bargaining agreements, *id.* at 15.

Soon thereafter the parties filed cross-motions for summary judgment. On March 1, 1984, the District Court issued a memorandum opinion, 580 F.Supp. 1490 (E.D.Mo.1984), explaining in detail the basis for its February 7, 1984 preliminary injunction and granting in part the railroads' motions for summary judgment. The District Court made detailed findings of fact, including a finding that the strike threatened by UTU would cause irreparable injury to MOPAC and to the thousands of shippers it serves. In its conclusions of law, the District Court held that (a) the dispute between MOPAC and UTU is a "minor" dispute within the meaning of the Railway Labor Act, and, therefore, section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, does not bar a labor injunction; (b) alternatively, if this is a "major" dispute within the meaning of the Railway Labor Act, the threatened strike would be illegal because the ICC has exempted the railroads from any duty to negotiate with appellants concerning crew selection for KATY's trackage rights, and section 4 of the Norris-LaGuardia Act must give way to the ICC's power to determine labor disputes in connection with consolidation and trackage rights proceedings; and (c) section 8 of the Norris-LaGuardia Act, 29

U.S.C. § 108, does not prevent the issuance of a preliminary injunction because plaintiffs have not violated its provisions. 580 F.Supp. at 1499–1506.

On March 30, 1984, the District Court entered its permanent injunction against the threatened strike, and issued an accompanying memorandum which, *inter alia,* denied UTU's motion to exclude from the scope of the injunction the individual union members. D.R. at 139–45.

Meanwhile, UTU and another union, the Brotherhood of Locomotive Engineers, petitioned the United States Court of Appeals for the District of Columbia Circuit to vacate the ICC orders granting KATY the right to use its own crews in trackage rights service and exempting under 49 U.S.C. § 11341(a) these crew selection prerogatives from the Railway Labor Act and other laws. On May 3, 1985 (several months after oral argument had been heard on the appeal in the instant case) the District of Columbia Circuit handed down its decision. *Brotherhood of Locomotive Engineers v. ICC,* 761 F.2d 714 (D.C.Cir. 1985), *petition for cert. filed,* 54 U.S.L.W. 3359 (U.S. Nov. 7, 1985) (No. 85–792). In a two-to-one decision, the D.C. Circuit panel held that the ICC had failed to show that the exemption from the Railway Labor Act respecting crew selection was necessary. Accordingly, the court vacated the ICC orders relied upon by the railroads and left the parties to their Railway Labor Act remedies. A petition for rehearing and suggestions for rehearing en banc were filed, and on July 12, 1985, the D.C. Circuit *sua sponte* amended its opinion so that instead of leaving the parties to their Railway Labor Act remedies the court remanded the case to the ICC, giving the ICC the opportunity to exercise its exemption authority by explaining "why termination of the asserted right to participate in crew selection is necessary to effectuate the pro-competitive purpose of the grant of trackage rights or some other purpose sufficiently related to the transaction." *Id.* at 725. The opinion thus having been amended, the petition for rehearing and suggestions for

rehearing en banc were denied on August 9, 1985.

The ICC then petitioned the Supreme Court for a writ of certiorari; the Court has not yet ruled on the petition, and the D.C. Circuit, which first stayed its mandate and then eventually issued it on November 12, 1985, recalled its mandate on November 18, 1985 pending the Supreme Court's action. The ICC orders relied upon by MO-PAC and KATY, and by the District Court, are thus still in force.

On December 23, 1985, appellants filed a petition for a writ of certiorari requesting the Supreme Court, if it grants review of the D.C. Circuit case, to review the present case before judgment by our Court. The Supreme Court has not yet acted upon this petition. We could hold our decision in abeyance during the pendency of the petition, or proceed to issue it now. For whatever assistance it may be to the parties and to the progress of the litigation, we issue it now.

 As the District Court correctly noted, if a dispute is minor and cannot be resolved by the normal grievance procedure, the parties must submit their differences to the National Railroad Adjustment Board, the jurisdiction of which is exclusive. *See Andrews v. Louisville & Nashville Railroad Co.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). It follows that a strike over minor disputes violates the Railway Labor Act and may be enjoined by a federal district court, notwithstanding the prohibitions of the Norris-LaGuardia Act. *See Brotherhood of Locomotive Engineers v. Louisville & Nashville Railroad Co.,* 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); *Chicago and Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 277 (7th Cir. 1981). On the other hand, the Norris-LaGuardia Act prevents the issuance of an injunction against a railway labor strike over a major dispute, since the Railway Labor Act requires only that the parties negotiate major disputes and "does not provide a process for a final decision like that of the Adjustment Board in a 'minor dis-

pute' case." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 42 n. 24, 77 S.Ct. 635, 641 n. 24, 1 L.Ed.2d 622 (1957). The District Court further noted correctly that the essential test is whether the dispute "evolv[es] from the bargaining process for a new or altered contract" (major dispute) or whether the dispute is "over the meaning of an existing collective bargaining agreement" (minor dispute). 580 F.Supp. at 1500 (quoting *Chicago and Northwestern Transportation,* 656 F.2d at 277–78). The District Court then relied upon the strike threat Mailgram from UTU for the conclusion that the instant dispute is a minor rather than a major one. As previously mentioned, UTU's Mailgram demanded a halt to MOPAC's "trespass on our collectively bargained agreements and our seniority." Based thereon, the District Court concluded that the dispute was "reasonably susceptible to resolution by reference to the contracts between the parties." 580 F.Supp. at 1500.

■ Appellants contend that the District Court's resolution of the "minor dispute" question on motions for summary judgment was inappropriate because there was a factual dispute as to the underlying reasons for the threatened strike. Appellants submitted an affidavit to show that the dispute involved unsuccessful efforts to negotiate modifications to existing working conditions, and thus that the dispute was a major dispute. We agree with appellants that the affidavit created a factual issue sufficient to preclude summary judgment on the "minor dispute" ground. *See* Fed. R.Civ.P. 56(c).

■ Our conclusion that the District Court erred in ruling the dispute a minor dispute on motions for summary judgment is not, however, the end of the matter, for the court also held, as an alternative basis for its decision, that even if the dispute is a major dispute the Norris-LaGuardia Act does not bar a labor injunction in this case. In a carefully reasoned opinion the District Court held that MOPAC is exempted under § 11341(a) of the Interstate Commerce Act

(ICA), 49 U.S.C. § 11341(a), from the requirements of the Railway Labor Act (RLA) with respect to major disputes. We quote from the District Court's opinion:

> RLA § 156 imposes a duty on carriers to negotiate over certain "major" disputes. 45 U.S.C. § 156. It is easy to see why it is necessary that MOPAC be exempted from that duty, insofar as it relates to UTU's demand that MOPAC negotiate over the selection of forces to operate KATY trains on MOPAC lines. There is nothing that UTU/MOPAC negotiations could do to change the crew selection provisions approved by the ICC. Under the ICA the ICC has authority to approve the transactions, including trackage rights agreements, between carriers. 49 U.S.C. § 11341 *et seq.* Here the ICC expressly and emphatically stated that "[p]rovisions of trackage rights agreements designating which carrier's employees will perform trackage rights operations are material terms of the agreement and *may be implemented without further approval.*" F.D. No. 30,000 (Sub-No. 18) *et al.*, (October 19, 1983), at 15 (emphasis added). *See Finding of Fact No. 23.* MOPAC cannot unilaterally change a material term of a trackage rights agreement approved by the ICC and therefore MOPAC was immune from any requirement of the RLA to negotiate over such a material term.

580 F.Supp. at 1502–03 (footnote omitted). In addition, the District Court rejected UTU's argument that it remains free to strike over MOPAC's refusal to negotiate about the selection of forces for KATY trains operating on MOPAC lines. To the contrary, the District Court held that in this case the antiinjunction provisions of the Norris-LaGuardia Act (NLGA) are displaced by the jurisdiction of the ICC under the Interstate Commerce Act. The court's essential reasoning is set forth in the following passage from its opinion:

> In the case at bar the ICC authoritatively resolved the question of which employees may operate KATY's trains over MOPAC lines. The NLGA must be

accommodated to this exercise of the ICC's power, because allowing UTU to strike would be tantamount to saying that UTU has carte blanche authority to frustrate and avoid a material term of a consolidation approved by the ICC. Congress did not intend that affected employees have such power to block consolidations which are in the public interest.

Although it is not for this Court to question the wisdom of Congress' action, in this case it is not difficult to see why Congress intended the NLGA to be inapplicable to ICC-resolved, consolidation-related labor disputes. In the case at bar, UTU and other labor representatives participated in the ICC proceedings. *See Finding of Fact No. 6.* UTU does not contend that it did not have adequate opportunities to object to any provision of the transaction, including the trackage rights agreement, or to seek favorable treatment. UTU either failed to object to the crewing provisions of KATY's trackage rights application or it did object and the ICC rejected its objection. In either case, it is inconceivable that Congress intended that a labor union would be able to participate in ICC approval proceedings and then, if the union was dissatisfied with the result or a part thereof, strike a carrier to obtain the advantage it desired.

Moreover, it is not probable that Congress intended to allow UTU to strike where UTU's objective is to obtain an advantage which MOPAC is now unable to give—the right to operate KATY trains that run over MOPAC lines. If MOPAC gave that right to any of its employees, MOPAC would breach its agreement with KATY and would vary a material term of an agreement approved by the ICC. If UTU obtained its objective by striking, wouldn't KATY employees then be free to strike to obtain the same advantage? To avoid the stifling effects that such economic power would have on any attempt to consolidate railroad operations, Congress vested the ICC with the authority to resolve such disputes during approval proceedings. Affected employees are not left out in the cold, because § 11347 requires the ICC to impose employee protective conditions. 49 U.S.C. § 11347. The balance and efficiency which Congress sought to achieve with this scheme would be essentially and materially frustrated if employees were free to strike.

580 F.Supp. at 1505–06 (footnote omitted).

We agree with the reasoning of the District Court on the alternative ground set forth above and believe that the court clearly was correct in permanently enjoining appellants from striking, picketing, and engaging in other forms of concerted action over the crew selection issue already decided by the ICC. We have considered all the arguments raised by appellants and find them to be without merit. Accordingly, we affirm the judgment of the District Court on the basis of that court's well-reasoned opinion.

AFFIRMED.