848 F.2d 856
 128 L.R.R.M. (BNA) 2527, 130 L.R.R.M. (BNA)
2072, 56 USLW 2702,
109 Lab.Cas. P 10,520
 BURLINGTON NORTHERN RAILROAD COMPANY, Appellee,
v.
UNITED TRANSPORTATION UNION, Appellant.
Fred A. Hardin, J.W. Reynolds, Brotherhood of Locomotive
Engineers, J.F. Sytsma and W.C. Walpert.
RAILWAY LABOR EXECUTIVES' ASSOCIATION,
v.
BURLINGTON NORTHERN RAILROAD COMPANY, Appellee,
v.
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Brotherhood of
Locomotive Engineers, United Transportation Union,
Appellant.
BURLINGTON NORTHERN RAILROAD COMPANY, Appellant,
v.
UNITED TRANSPORTATION UNION, Appellee,
Fred A. Hardin, J.W. Reynolds, Brotherhood of Locomotive
Engineers, J.F. Sytsma and W.C. Walpert.
RAILWAY LABOR EXECUTIVES' ASSOCIATION,
v.
BURLINGTON NORTHERN RAILROAD COMPANY, Appellant,
v.
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Brotherhood of
Locomotive Engineers, United Transportation Union, Appellee.
 Nos. 87-2581, 87-2600.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1987.
Decided May 31, 1988.
Rehearing and Rehearing En Banc Denied Sept. 16, 1988.
Rehearing and Rehearing En Banc Denied Sept. 23, 1988.
 
 Clint Miller, Cleveland, Ohio, for United Transp. Union et al.
 Richard Schreiber, Fort Worth, Tex., for Burlington Northern.
 Before HEANEY, ARNOLD and FAGG, Circuit Judges.
 HEANEY, Circuit Judge.
 
 I. Overview
 
 1
 Burlington Northern Railroad Company (BN) announced its intention to sell a section of its rail lines to the Montana Rail Link (MRL), a newly formed corporation. This type of transaction was recently exempted from Interstate Commerce Commission (ICC) approval requirements, which generally involved the imposition of labor protective conditions. See Ex Parte No. 392 (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines under 49 U.S.C. 10901, 1 I.C.C.2d 810 (1986), review denied sub nom. Illinois Commerce Comm'n. v. ICC, 817 F.2d 145 (D.C.Cir.1987) (Ex Parte No. 392 ). After unsuccessfully attempting both to engage BN in negotiations over the effects of the sale on BN employees and later to enjoin the sale, the United Transportation Union (UTU) threatened to strike. BN sought a preliminary injunction against the strike. The district court denied BN's request, finding the Norris-LaGuardia Act, 29 U.S.C. Secs. 110-115 (Norris-LaGuardia) prohibited such relief. It did, however, grant an injunction pending review by our Court. On appeal, BN claims that Norris-LaGuardia must be accommodated to the action of the ICC in Ex Parte No. 392, and thus cannot bar an injunction. Alternatively, it argues that the Railway Labor Act, 45 U.S.C. Secs. 151-188 (RLA), prohibits the strike because the UTU has not exhausted major dispute procedures under that Act.
 
 
 2
 We affirm the decision of the district court insofar as it held that Norris-LaGuardia prevents the issuance of an injunction here, and we dissolve the injunction issued by the district court pending this appeal. Second, we find the RLA's major dispute procedures are, in this instance, superseded by the terms of the Interstate Commerce Act, 49 U.S.C. Sec. 10101-11917 (ICA), and thus cannot bar the strike.
 
 II. Factual Background
 
 3
 In July, 1987, BN announced its intention to lease approximately 830 miles of its trackage to MRL, a newly formed corporation. These rail lines extend from Huntley, Montana, to Sand Point, Idaho. BN also proposed to sell various branch lines, equipment, personal property, and facilities to MRL. In the past, this transaction would have been contingent upon the approval of the ICC, and labor protective conditions would normally have been imposed for the protection of BN employees. However, recently, such sales have been exempted from ICC approval procedures. See Ex Parte No. 392, 1 I.C.C.2d 810 (1986).
 
 
 4
 In compliance with Ex Parte No. 392, MRL filed a petition for exemption. Under the terms of Ex Parte No. 392, such exemptions are automatically granted seven days after they are filed. See 49 C.F.R. Sec. 1150.32(b). Several parties requested a stay of the exemption. The ICC, however, denied those requests and the exemption issued on July 31, 1987. Finance Docket No. 31087, decided July 31, 1987, Montana Rail Link, Inc.--Exemption Acquisition and Operation--Certain Lines of the Burlington Northern Rail Company. Subsequently, a number of the unions representing BN employees, including the UTU, filed petitions to revoke the exemption. These petitions requested labor protection for BN employees affected by BN's action. The ICC has not yet ruled on these petitions. The transaction was closed on October 31, 1987, after the ICC made a specific finding that it was "in the public interest" and after the unions unsuccessfully sought an injunction against the transaction in the United States District Court for the District of Montana. United Transp. Union v. Burlington Northern R.R., 672 F.Supp. 1579 (D.Mont.1987).
 
 
 5
 Before the Montana district court, the unions sought to enjoin the sale and maintain the status quo until the arbitration and mediation provisions of the RLA were exhausted. The district court refused to grant this request. Relying on Railway Labor Executives' Ass'n v. Staten Island R.R., 792 F.2d 7 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), it found that the mandatory bargaining procedures of the RLA would frustrate the action of the ICC and thus did not provide the court with authority to issue an injunction. 672 F.Supp. at 1582. However, the court, citing Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R., 831 F.2d 1231 (3rd Cir.1987), did note that there was no inherent incompatibility between the ICC's action and the provisions of Norris-LaGuardia, thus suggesting that Norris-LaGuardia would bar an effort to enjoin a subsequent strike by the unions. 672 F.Supp. at 1582-83 n. 3. The UTU has appealed this decision to the Ninth Circuit.
 
 
 6
 After the Montana district court denied the unions' motion to enjoin the sale, the UTU threatened a nationwide strike against BN. BN immediately sought a temporary restraining order and a preliminary injunction from Judge Joseph E. Stevens of the United States District Court for the Western District of Missouri. See Burlington Northern R.R. v. United Transp. Union, No. 86-5013-CV-SW-8, slip op. (W.D.Mo. Nov. 16, 1987). The court granted the temporary restraining order but subsequently denied the request for a preliminary injunction. In declining to issue a preliminary injunction, Judge Stevens placed primary reliance on Pittsburgh and Lake Erie, 831 F.2d 1231. A few hours later, the court granted BN's motion for an injunction pending appeal. We denied UTU's motion to suspend the injunction pending appeal and directed BN to avoid further layoffs until we had decided the matter.
 
 
 7
 On appeal, BN contends that the ICA vests the ICC with exclusive and plenary jurisdiction to resolve disputed issues. Thus, they argue, Norris-LaGuardia does not bar an injunction against the proposed strike. Second, BN maintains the RLA prohibits the strike since UTU has not exhausted major dispute procedures.
 
 III. The ICA, the RLA and Norris-LaGuardia
 A. Statutory Framework
 1. The Interstate Commerce Act (ICA)
 
 8
 The ICA is fundamentally a statute designed to regulate commerce. Its goal is to make commerce flow smoothly to the benefit of both American industry and consumers. The Act seeks to ensure fair shipping rates, safety and efficiency in transportation, and to preserve the viability of various modes of transportation. The ICA also seeks to discourage harmful monopolistic practices, detrimental state regulation, and labor strife--all of which tend to impede commerce to the detriment of industry and consumers. See 49 U.S.C. Secs. 10101, 10101a.
 
 
 9
 The ICA generally requires that before a railroad acquires an additional line or abandons a line, the rail carriers involved in the transaction must obtain the approval of the ICC. 49 U.S.C. Secs. 10901, 10903. Pursuant to the ICA's goal of preventing labor strife by "encourag[ing] fair wages and safe and suitable working conditions in the railroad industry," see 49 U.S.C. Sec. 10101a(12), approval by the ICC has in the past generally required the imposition of plans to compensate workers displaced by the particular transaction. These plans are called labor protective conditions or labor protective agreements. Under its authority, the ICC has developed standard labor protective conditions for particular types of transactions.[1]
 
 
 10
 In the early 1970's the railroad industry, for a variety of reasons, began to experience economic difficulty. In 1976, concern about the "financial health" of this industry prompted Congress to pass the Railroad Revitalization and Regulatory Reform (4-R) Act, Pub.L. No. 94-210, 90 Stat. 31 (1976). The 4-R Act empowered the ICC, inter alia, to exempt individual transactions or classes of transactions from the Act's prior approval requirements (and thus avoid the cost of labor protective conditions). Pub.L. No. 94-210, 90 Stat. at 42.
 
 
 11
 Four years later, in another deregulatory effort, Congress passed the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (1980). In the Staggers Act, Congress attempted to "reduce regulatory barriers to entry into and exit from the [railroad] industry." Id. Sec. 101(a), 94 Stat. 1897, codified at 49 U.S.C. Sec. 10101a. Specifically, the Act broadened the exemption provisions codified at 49 U.S.C. Sec. 10505, to provide that exemptions "shall" be granted to carry out the Staggers Act national rail policy. 94 Stat. at 1913.
 
 
 12
 In 1986, the ICC, in an ex parte rule-making procedure, exercised its new section 10505 power to exempt, as a class, line sales to "new carriers"[2] from the detailed approval procedures required under section 10901. See Ex Parte No. 392, 1 I.C.C.2d 810 (1986). To facilitate these sales, the ICC further prescribed an expedited approval procedure in place of the procedure that would otherwise apply under section 10901(b). Under the class exemption, sales to new carriers are authorized to go forward seven days after the parties file verified notices with the ICC. Id. at 820, see also 49 C.F.R. Sec. 1150.32(b).
 
 
 13
 The ICC's action in Ex Parte No. 392 was appealed to the United States Court of Appeals for the District of Columbia Circuit. That court denied review of the ICC's action without an opinion. Illinois Commerce Comm'n v. ICC, 817 F.2d 145 (D.C.Cir.1987).
 
 2. The Railway Labor Act (RLA)
 
 14
 The RLA regulates the relationship between railroads and their employees. The purposes of the Act include avoiding interruption to commerce, ensuring worker freedom of association and the right to unionize, providing for the "prompt and orderly" settlement of employment related disputes, and securing the "complete independence" of railroads and their employees in matters of self-organization and in carrying out the Act's other purposes. See 45 U.S.C. Sec. 151a.
 
 
 15
 Under the RLA, controversies over proposed changes in collective bargaining agreements are termed "major" disputes (to be distinguished from "minor" disputes over the "interpretation or application" of existing agreements and practices). Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723-24, 65 S.Ct. 1282, 1289-90, 89 L.Ed. 1886 (1945). Under Secs. 2 Seventh and 6 of the Act, a party desiring to change a working condition embodied in an existing agreement, or to bring a condition not previously covered within an agreement, must serve a "Sec. 6 notice" upon the opposing party. 45 U.S.C. Secs. 152 Seventh, 156. The resulting major dispute is subject to dispute resolution including conferences, mediation, and, in some cases, proceedings before a presidential emergency board. 45 U.S.C. Secs. 155, 156, 160. Until these procedures are exhausted, neither party may change the status quo, i.e., the "actual objective working conditions" in existence at the beginning of the dispute. Detroit & T. Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 149, 153, 90 S.Ct. 294, 298, 301, 24 L.Ed.2d 325 (1969).[3]3. The Norris-LaGuardia Act
 
 
 16
 The Norris-LaGuardia Act withdraws jurisdiction from the federal courts in cases growing out of labor disputes. The Act clearly states:
 
 
 17
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as the terms are herein defined) from * * *
 
 
 18
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment.
 
 
 19
 29 U.S.C. Sec. 104.
 
 
 20
 The public policy behind Norris-LaGuardia is clearly stated in the Act. Specifically, the Congress found that prevailing socio-political and economic conditions prevented individual workers from obtaining "acceptable terms and conditions of employment." Therefore, Norris-LaGuardia sought to ensure workers the right to organize and conduct union activities "free from the interference, restraint, or coercion" of employers or their agents by means of labor injunctions. See 29 U.S.C. Sec. 102.
 
 B. Analysis
 
 21
 As noted above, the ICA is fundamentally a commerce statute directed toward ensuring the free flow of commerce. The RLA is a labor statute that orders the relationship between railroads and their employees. Norris-LaGuardia is a jurisdictional labor statute designed to deal with historical anti-union animus in the federal courts by withdrawing jurisdiction in cases growing out of labor disputes. Each of these congressional enactments are intended to be preeminent in terms of the subject matter they regulate. However, toward the periphery of the authority granted under each law, there exist overlapping powers and responsibilities which must be accommodated and harmonized.
 
 
 22
 For example, when the imperatives of labor statutes such as the RLA and Norris-LaGuardia conflict, the federal courts have determined that if the provisions of the RLA represent some "overriding, equally clear yet irreconcilable labor policy" which would be frustrated by the literal enforcement of Norris-LaGuardia's anti-injunction provisions, the latter act can be accommodated. Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R., 831 F.2d 1231, (citing Chicago & North Western Ry. v. United Transp. Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Boys Market, Inc. v. Retail Clerk's Union Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R., 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); Brotherhood of R.R. Trainmen v. Chicago & Indiana R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Brotherhood of Ry. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952)).
 
 
 23
 Yet, the problem of harmonizing labor statutes with statutes in other fields--particularly those which encourage commerce and industrial expansion--presents far more difficult balancing problems. In this age of trade unions with nationwide membership, it is increasingly difficult to remember that without the clear protections erected by the Congress in Norris-LaGuardia, the RLA, and the National Labor Relations Act, 29 U.S.C. Secs. 151-187, the right to organize, the right to bargain collectively, and the right to strike in the United States were simply untenable propositions.
 
 
 24
 The preamble to Norris-LaGuardia recognized this problem in stark terms. The statute withdrew jurisdiction from the federal courts to enjoin labor disputes in the realization that:
 
 
 25
 Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment * * *.
 
 
 26
 29 U.S.C. Sec. 102 (emphasis added).
 
 
 27
 Moreover, the Supreme Court has recently recognized the fundamental importance of Norris-LaGuardia in terms of the viability of the labor movement:
 
 
 28
 The Norris-LaGuardia Act ... expresses a basic policy against the injunction of activities of labor unions.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 The congressional debates over the Norris-LaGuardia Act disclose that the Act's sponsors were convinced that the extraordinary step of divesting federal courts of equitable jurisdiction was necessary to remedy an extraordinary problem.
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 The Norris-LaGuardia Act responded directly to the * * * pattern of injunctions entered by federal judges. "The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction."
 
 
 35
 Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes, 481 U.S. ----, 107 S.Ct. 1841, 1846-47, 95 L.Ed.2d 381 (1987) (citations omitted).
 
 
 36
 Finally, experience shows that as the protections of labor statutes are diluted, even under the "neutral" terms of deregulatory actions by Congress, the economic power of employees is visibly diminished by both contracting the authority of their representatives to bargain on their behalf and by reducing the ranks of their organized membership.
 
 
 37
 With this in mind, we turn to the task of exploring the interplay between the ICA, the RLA, and Norris-LaGuardia.
 
 
 38
 Under the ICA, Congress sought to provide the ICC with the means to prevent labor strife by assuring "fair wages and working conditions in the railroad industry." 49 U.S.C. Sec. 10101a(12). To accomplish this important but limited aim, Congress provided the ICC superseding authority to supervise and implement labor protective conditions in terms of acquisitions, sales, and abandonments of railroad lines. But it did so only insofar as this authority is necessary to "assure fair wages and working conditions" in order to ensure the free flow of commerce. In these narrow circumstances, the ICA supersedes the authority of the mandatory bargaining provisions of the RLA which provide an essentially duplicative or overlapping process designed to reach labor protective agreements. Were it otherwise, the ICC's authority in this area, and specifically its recent deregulatory actions, would be largely nullified. However, the ICA does not so easily supersede Norris-LaGuardia for, except where Congress has specifically exempted the ICA from the operation of other laws and required mandatory labor protective conditions, nowhere in the ICA is there any indication of its direct incompatibility with the anti-injunction statute. Clearly, Norris-LaGuardia says nothing about the methods by which labor protective agreements are made, but rather represents a completely independent and very clear decision by Congress to insulate labor disputes from the injunctive powers of the federal courts.
 
 
 39
 Our decision in Missouri Pacific Ry. v. United Transp. Union, 782 F.2d 107 (8th Cir.1986) (per curiam), cert. denied, --- U.S. ----, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987), when read in conjunction with Railway Labor Executives' Ass'n v. Staten Island R.R., 792 F.2d 7 and Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R., 831 F.2d 1231 illustrates implicitly the interaction of these three federal statutes.
 
 
 40
 In Missouri Pacific, we held that when a consolidation transaction subject to 49 U.S.C. Secs. 11341, 11347, statutory provisions which specifically exempt carriers from all other law[4] and require mandatory employee protective conditions[5], neither the RLA nor Norris-LaGuardia could operate to restrict the terms of the ICA. In the Staten Island case, the Second Circuit found, in a transaction governed by 49 U.S.C. Sec. 10905 (similar to the transaction here in controversy), there was jurisdiction under the RLA in terms of the bargaining relationship between the railroad and the unions. However, the court found that the ICA's action approving the transaction withdrew from the courts the power under the RLA to "formulate a meaningful remedy without impinging on the ICC's order approving the sale in question."[6] 792 F.2d at 12, see also United Transp. Union v. Burlington Northern R.R., 672 F.Supp. 1579, 1582-83. They thus dismissed the case under Fed.R.Civ.P. 12(b)(6).[7]
 
 
 41
 Finally, in the Pittsburgh & Lake Erie case, the Third Circuit, with a transaction identical to the one before us, faced a request by an employer railroad to accommodate Norris-LaGuardia to the ICA. The court refused to do so, recognizing both the overriding importance of Norris-LaGuardia and finding no irreconcilability between the ICC's authority over the bargaining process and Norris-LaGuardia's prohibition against injunctions. Specifically, the court stated:
 
 
 42
 [None of the provisions] relied on by P & LE which makes the ICC's authority "exclusive" with respect to combinations of carriers, contains any language which would suggest Congress intended to override the anti-injunction policy of section 4 of the Norris-LaGuardia Act by the Interstate Commerce Act. * * * Neither the ICC nor P & LE have pointed to any language in the legislative history of any of the labor laws or the Interstate Commerce Act which suggests that the strong national policy embodied in the Norris-LaGuardia Act is to be subordinated to the ICC's authority to approve an acquisition of railroad property.
 
 
 43
 831 F.2d at 1235-36.
 
 
 44
 Thus, the interplay of these three statutes can be summed up as follows. When the ICA provides a specific exemption from all other law and mandates inescapable employee protective conditions under provisions such as 49 U.S.C. Secs. 11341(a), 11347, it effectively supersedes both the RLA and Norris-LaGuardia. If there is no exemption and specific protection is not mandated, the authority of the ICA only extends to the bargaining process concerning wages and working conditions. In these circumstances, while the bargaining provisions of the RLA are superseded, Norris-LaGuardia is unaffected and remains to protect the employees' interests.[8]
 
 
 45
 Moreover, this notion of the viability of Norris-LaGuardia in the face of the supersedure of the RLA is clearly in line with what Congress intended. In examining the impetus behind the recent deregulatory efforts in the railroad industry, Congress has sought to free the union-management relationship from time-consuming, "process oriented" bureaucracy imposed by various regulatory statutes and to allow the sagacious invisible hand of the free market economy to reorder rapidly that industry's economic difficulties. Thus, while we agree with BN's contention that enforcing the mandatory bargaining provisions of the RLA might render the changes in the ICA without much practical force, we find, like the Third Circuit, no inherent incompatibility between these actions and Norris-LaGuardia. Clearly implicit in the congressional vision of a vigorous free market is the realization that all major participants in the economy must be left free to exercise their economic strength and thus return the economy to its natural order. We thus find it impossible to believe that Congress would leave the railroads free to exercise their economic power to advance their goals, yet forbid the unions to use their strength to protect the interests of their membership.
 
 
 46
 In the end, should Congress wish to accommodate Norris-LaGuardia to the ICC in this situation, it can do so explicitly. Such a decision concerning such a significant change in federal labor policy is too important to be found implicitly by a court in the interstices of a federal statutory scheme.
 
 IV. Conclusion
 
 47
 In its decision in Ex Parte No. 392, the ICC has acted within its authority by exempting, as a class, sales to new carriers from the requirement of imposing labor protective conditions. Moreover, the ICC's authority to supervise and implement labor protective conditions in terms of sales, acquisitions, and abandonments by railway carriers insofar as this authority is necessary to "assure fair wages and working conditions" supersedes the authority of the mandatory bargaining provisions of the RLA. We thus dismiss BN's claim under the RLA.[9] However, we find no inherent incompatibility between the recent deregulatory efforts of the Congress and the ICC and the continued viability of Norris-LaGuardia in the circumstances presented here. We thus affirm the decision of the district court declining to issue an injunction against the proposed strike by the UTU and dissolve the temporary injunction put in place pending this appeal.
 
 
 48
 FAGG, Circuit Judge, dissenting.
 
 
 49
 The district court denied BN's motion for a preliminary injunction against UTU's threatened strike, disclaiming jurisdiction to enjoin the strike on account of the Norris-LaGuardia Act (NLGA). See 29 U.S.C. Sec. 104. I do not share the district court's view that injunctive relief is unavailable to protect an ICA order from disruption by a union strike that in essence challenges the terms of that order.
 
 
 50
 The court correctly observes that when the NLGA and the ICA overlap, they "must be accommodated and harmonized." Ante at 861. This accommodation is necessary because neither statute "may meaningfully be read in isolation * * * for they are in fact, an integrated plan of railroad regulation. And if, as is frequently the case in such undertakings, there be overlappings, '[w]e must determine * * * how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.' " Order of R.R. Telegraphers v. Chicago & N.W. Ry., 362 U.S. 330, 352, 80 S.Ct. 761, 772, 4 L.Ed.2d 774 (1960) (quoting Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945)) (Whittaker, J., dissenting).
 
 
 51
 There is no dispute the ICC has discretionary authority to impose labor protective conditions in this type of transaction. See 49 U.S.C. Sec. 10901(c)(1)(A)(ii); Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R., 831 F.2d 1231, 1235 (3d Cir.1987); Winter v. ICC, 828 F.2d 1320, 1323 (8th Cir.1987). It is also clear the ICC has the power to grant or deny UTU's pending request for those conditions, ante at 858, and UTU will have access to judicial review of an adverse decision, see 28 U.S.C. Sec. 2321(a). Simply stated, Congress has charged the ICC with the responsibility to impose protective labor conditions that are "necessary in the public interest" in section 10901 transactions. 49 U.S.C. Sec. 10901(c)(1)(A)(ii).
 
 
 52
 The court holds, however, that when labor protective conditions are discretionary rather than mandatory, the ICA cannot displace the NLGA's antiinjunction provisions because that situation presents no "direct incompatibility" between the NLGA and the ICA. Ante at 862. I believe the court and the Third Circuit have drawn an illusory distinction between mandatory and discretionary conditions. See Railway Labor Executives' Ass'n, 831 F.2d at 1334-37. This approach to the issue has led the court mistakenly to conclude the district court was correct in deciding it was without jurisdiction to enjoin the UTU strike, and it is at this point that I respectfully part company with the court.
 
 
 53
 What is really involved in this case is this: whether UTU, displeased with ICC approval of BN's sale of a section of its rail lines to MRL, may bypass the ICC and direct its displeasure at BN for the singular purpose of extracting concessions that are at odds with the terms of the ICC order. I think not, and I believe my view is at the heart of the decision in Missouri Pacific Railroad v. United Transportation Union, 782 F.2d 107 (8th Cir.1986) (per curiam), cert. denied, --- U.S. ----, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987) (MoPac ). In adopting the district court's decision permitting the injunction, the court in MoPac stated:
 
 
 54
 [A]llowing UTU to strike would be tantamount to saying that UTU has carte blanche authority to frustrate and avoid a material term of a consolidation approved by the ICC. Congress did not intend that affected employees have such power to block consolidations which are in the public interest. * * * [I]t is inconceivable that Congress intended that a labor union would be able to participate in ICC approval proceedings and then, if the union was dissatisfied with the result or a part thereof, strike a carrier to obtain the advantage it desired.
 
 
 55
 Id. at 112.
 
 
 56
 It is apparent a UTU strike here would be aimed at obtaining the essential equivalent of the same labor protective conditions UTU is actively seeking from the ICC. I am persuaded that in these circumstances, just as in cases in which protective conditions are mandatory, the NLGA cannot be used to thwart an ICC order approving the BN-MRL transaction. When viewed from this perspective the potential conflict, while undoubtedly relating to BN's relationship with its employees, does not bear the characteristics of an NLGA section 104 labor dispute. I believe Congress, through the ICA, has granted the ICC authority (subject to judicial review) to resolve conclusively the issues UTU seeks to raise by way of the threatened strike.
 
 
 57
 In sum, the UTU strike threat amounts to an unacceptable neutralization of congressional policy in favor of the ICC's exercise of expert authority to serve the public interest in the area of railroad service. I believe the provisions of the ICA embody the greater interest when a dispute involving a railroad and its employees has been triggered by an order of the ICC. In these circumstances, the competing aspects of the ICA and the NLGA should have been resolved by the district court in favor of the ICA. Thus, I would reverse the district court's order disclaiming jurisdiction to consider BN's injunction request.
 
 
 
 [1]
 When the transaction involves the sale of a rail line, the ICC imposes its New York Dock conditions upon the parties. See New York Dock Ry.--Control--Brooklyn E.D. Terminal, 360 I.C.C. 60 (1979), aff'd, 609 F.2d 83 (2d Cir.1979). If it is a case of abandonment, it imposes Oregon Short Line III conditions. See Oregon Short Line R.R.--Abandonment, 360 I.C.C. 91 (1979)
 
 
 [2]
 "New carrier" means a newly formed railroad not already subject to the ICA
 
 
 [3]
 The Act lacks any mechanism to compel agreement in major disputes. Binding arbitration of a major dispute is available only if both parties agree to it. See 45 U.S.C. Secs. 155, 157; Elgin J. & E. Ry., 325 U.S. at 725, 65 S.Ct. at 1290
 Section 3 of the RLA commits minor disputes over the "interpretation or application" of existing agreements and practices to the exclusive jurisdiction of Adjustment Boards, i.e. to "compulsory arbitration." Brotherhood of R.R. Trainmen v. Chicago R. & I.R.R., 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957); 45 U.S.C. Sec. 153 First (i); see Elgin J. & E. Ry., 325 U.S. at 724, 65 S.Ct. at 1290. If the resolution of a labor dispute arguably depends upon the interpretation or application of a collective bargaining agreement or established past practice, the dispute must go to an Adjustment Board, not to a court. Brotherhood of Maintenance of Way Employes v. Burlington Northern Ry., 802 F.2d 1016, 1022 (8th Cir.1986). While the controversy is pending before the Board, the carrier is free to apply its interpretation of the disputed agreement or past practices. Id.
 
 
 [4]
 49 U.S.C. Sec. 11341(a) provides:
 The authority of the Interstate Commerce Commission under this subchapter is exclusive. * * * A carrier, corporation, or person participating in [an] approved or exempted transaction is exempt from all other law, including State and municipal law, as necessary to let that person carry out the transaction. * * *
 "[T]his subchapter" refers to Subchapter III of Chapter 113 of the ICA, Secs. 11341-51, under which the transaction in Missouri Pacific was approved, and not 49 U.S.C. Sec. 10901, Subchapter I of Chapter 109 of the Act, applicable here.
 
 
 [5]
 49 U.S.C. Sec. 11347 provides:
 When a carrier is involved in a transaction for which approval is sought under [the consolidation provisions] of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement * * * protective of the interest of employees who are affected by the transaction * * *.
 
 
 [6]
 In Staten Island, the viability of Norris-LaGuardia in terms of the ICA was not at issue
 
 
 [7]
 In Railway Labor Executives' Ass'n. v. Pittsburgh & Lake Erie R.R., 845 F.2d 420 (3rd Cir.1988), the Third Circuit in a carefully crafted opinion by Judge Becker, recently found that the ICC's action in Ex Parte No. 392 did not preempt the RLA
 
 
 [8]
 In United Transp. Union v. Burlington Northern R.R., 672 F.Supp. 1579, the United States District Court for the District of Montana came to exactly this conclusion. This court, like ours, relying on Staten Island, found that mandatory bargaining provisions of the RLA were superseded by the terms of the ICA. However, the court, citing Pittsburgh & Lake Erie, found that the ICC's action did not affect the viability of Norris-LaGuardia. Specifically, the court stated:
 Both parties have brought to the attention of the court an opinion handed down by the Third Circuit on October 26, 1987, where the court reversed a district court decision enjoining a labor strike. The Third Circuit found that Section 4 of Norris-LaGuardia need not be accommodated to the Interstate Commerce Act. Railway Labor Executives' Association v. Pittsburgh & Lake Erie R.R. Co., 831 F.2d 1231 (3d Cir.1987).
 The case involved facts very similar to those in the instant case. The Railroad was selling its rail lines to a new non-carrier entity which filed for, and received, an exemption pursuant to section 10505 of the ICA. The union filed section 6 notices pursuant to the RLA and the railroad refused to negotiate. However, there the union chose to strike. Section 4 of the Norris-LaGuardia Act forbids federal district court injunctions against labor strikes. 29 U.S.C. Sec. 104.
 A strike by union members against their employer does not directly contradict or encroach upon the authority of the ICC. The authorization of the sale still stands, and at the same time the employees have the right to pressure the employer to negotiate labor protections. The case is distinguishable in that an injunction of the sale would itself directly contradict and infringe upon the authority of the ICC. Congress has given full authority over sales and acquisitions of railroads to the ICC pursuant to the ICA.
 
 
 [672]
 F.Supp. at 1582-82 n. 3 (emphasis added)
 
 
 [9]
 We would alternatively dismiss BN's claim under the RLA on the merits. BN maintains that a strike by the UTU should be enjoined because the UTU did not invoke the major dispute resolution procedures of the RLA and thus must exhaust their remedies before they can strike. The UTU did, however, attempt to do so by serving a Section 6 notice, but was frustrated in this effort by an arbitration award holding that, under the applicable collective bargaining agreements, the Union had no right to serve such a notice before April 1, 1988. We believe the operative fact here is that BN itself changed the status quo without serving a Section 6 notice and would thus be barred from seeking injunctive relief by its own omission